# EXHIBIT A

# EMPLOYMENT AGREEMENT

This Employment Agreement ("**Agreement**") is entered into by and between **BLUE-GRACE LOGISTICS LLC**, a Florida limited liability company, with an address of 2846 S. Falkenburg Rd., Riverview, FL 33578 (Email: generalcounsel@mybluegrace.com) (the "**Employer**") on behalf of itself, its subsidiaries and other corporate affiliates (collectively referred to herein as the "**Employer Group**"), and David Fahey, a resident of the state of Illinois, with an address of 2620 Brookside Lane unit 1801 Schaumburg, IL 6 (Home Email: david.fahey22@hotmail.com) (the "**Employee**") (the Employer and the Employee are collectively referred to herein as the "**Parties**") as of the 28 day of August, 2017 (the "**Effective Date**").

In consideration of the Employee's employment by the Employer or the continued employment if the Employee is currently employed by Employer, the mutual covenants and agreements set forth below, the payment of a $1,000.00 signing bonus, and other good and valuable consideration, all of which the Employee acknowledges to be good and valuable consideration for his/her obligations hereunder and the receipt and sufficiency of which are hereby acknowledged, the Employer and the Employee hereby agree as follows:

**1. Employment.** The Employer employs the Employee, and the Employee accepts employment with the Employer, on an at-will basis, which means that at any time, with or without notice, with or without cause, either the Employer or the Employee can terminate the employment relationship. The Employee understands that he/she must comply with the Employer's rules and regulations (including any Employee Handbook) as now in effect or as amended or adopted from time to time. Nothing in this Agreement shall alter the at-will nature of the employment relationship.

**2. Confidentiality and Security.**

(a) Confidential Information. The Employee understands and acknowledges that during the course of employment by the Employer, he/she will have access to and learn about confidential, trade secret and proprietary documents, materials and other information, in tangible and intangible form, of and relating to the Employer Group, its businesses and existing and prospective customers, suppliers, investors and other associated third parties ("**Confidential Information**"). The Employee further understands and acknowledges that this Confidential Information and the Employer's ability to reserve it for the exclusive knowledge and use of the Employer Group is of great competitive importance and commercial value to the Employer, and that improper use or disclosure of the Confidential Information by the Employee might cause the Employer to suffer immediate and irreparable harm.

For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets (as defined by applicable state law), computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, , accounting records, , pricing information, credit information, design information, payroll information, personnel information, employee lists, supplier lists, vendor lists, , security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, , audio-visual programs, inventions, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, distributor lists, and buyer lists of the Employer Group or its businesses, or any existing or prospective customer, supplier, investor or other associated third party, or of any other person or entity that has entrusted information to the Employer in confidence.

The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

(b) Disclosure and Use Restrictions. During the term of Employee's employment with Employer and at all times after termination of Employee's employment with Employer for any reason (a "termination of employment" for purposes of the Employee's covenants and obligations throughout this Agreement shall exclude a technical termination occasioned by the purchase, merger, consolidation or otherwise of the Employer where the Employee's employment continues in any capacity whatsoever with such successor entity), Employee agrees: (a) not to publish, copy, disclose, allow to be published, copied or disclosed, or use for his or her own benefit or for the benefit of any other person, firm, corporation, business or entity, the Confidential Information without the prior written consent of Employer; (b) to maintain strictly the confidentiality of the Confidential Information at all times; and (c) to take all necessary precautions to protect against unauthorized disclosure or use of the Confidential Information except that Employee may disclose such information to persons, firms or corporations who need to know such information during the course and within the scope of Employee's employment. Employee acknowledges that the Confidential Information is the property of the Employer and agrees that all Confidential Information will be returned to Employer immediately upon termination of Employee's employment for whatever reason. Employee agrees to execute an affidavit as to the complete return of all Confidential Information if Employer so requests.

(c) Duration of Confidentiality Obligations. The Employee understands and acknowledges that his/her obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information (whether before or after he/she begins employment by the Employer) and shall continue during and after his/her employment by the Employer until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

3. **Proprietary Rights.**

(a) Work Product. The Employee acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived or reduced to practice by the Employee individually or jointly with others during the period of his/her employment by the Employer (or completed within six (6) months thereafter, with respect to any specific work product that was substantially begun during the Employee's period of employment by the Employer) and relating in any way to the business or contemplated business, research or development of the Employer (regardless of when or where the Work Product is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical and electronic copies and other tangible embodiments thereof (collectively, "**Work Product**"), as well as any and all copyright, trade secret, trademark (and related goodwill), patent and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions and renewals thereof (collectively, "**Intellectual Property Rights**"), shall be the sole and exclusive property of the Employer.

For purposes of this Agreement, Work Product includes, but is not limited to, Employer Group information, including plans, publications, research, strategies, techniques, agreements, documents, contracts, terms of agreements, negotiations, know-how, computer programs, computer applications, software design, web design, work in process, databases, manuals, results, developments, reports, graphics, drawings, sketches, market studies, formulae, notes, communications, product plans, product designs, styles,

models, ideas, audio-visual programs, inventions, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, client information, customer lists, client lists, advertising information and sales information.

(b) Work Made for Hire; Assignment. The Employee acknowledges that, by reason of being employed by the Employer at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter shall be deemed "work made for hire" as defined in 17 U.S.C. § 101, in which copyrights are therefore owned by the Employer. To the extent that the foregoing does not apply, the Employee hereby irrevocably assigns and agrees to assign to the Employer the Employee's entire right, title and interest in and to all Work Product and Intellectual Property Rights, including the right to sue, counterclaim and recover for all past, present and future infringement, misappropriation or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Employer's rights, title or interest in any Work Product or Intellectual Property Rights so as to be less in any respects than that the Employer would have had in the absence of this Agreement.

(c) Execution of Documents. The Employee agrees to execute and deliver to the Employer any and all applications, oaths, declarations, affidavits, waivers, assignments and other documents and instruments as shall be requested by the Employer (either during or after the Employee's employment) to obtain, perfect, transfer to the Employer or enforce any of the aforementioned rights in any jurisdiction throughout the world, and to render all lawful assistance in connection with the same. The Employee hereby irrevocably grants the Employer power of attorney to execute and deliver any such documents on the Employee's behalf and in his/her name, to the full extent permitted by law, if the Employee does not promptly cooperate with the Employer's request for such documents (without limiting the rights the Employer shall have in such circumstances by operation of law).

(d) No License. The Employee understands that this Agreement does not, and shall not be construed to, grant the Employee any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software or other tools made available to him/her by the Employer.

**4. No Solicitation of Employees.** The Employee agrees that, both during the Employee's employment with the Employer and for a period of two (2) years following the termination of the Employee's employment with the Employer at any time and for any reason, the Employee will not, directly or indirectly, on the Employee's own behalf or on behalf of any other person or entity, hire or solicit to hire or cause to be hired for employment or consulting or provision of any services for remuneration, any person who is actively employed or engaged (or in the preceding six months was actively employed or engaged) by the Employer. This includes, but is not limited to, inducing or attempting to induce, or influencing or attempting to influence, any person employed or engaged by the Employer to terminate his or her relationship with the Employer.

**5. No Solicitation of Customers.** The Employee agrees that, both during the Employee's employment and for a period of two (2) years following the termination of the Employee's employment with the Employer at any time and for any reason, the Employee will not directly or indirectly, on the Employee's own behalf or on behalf of any other person or entity, solicit the business of any Customer or any other entity with which the Employer has an agreement, at the time of Employee's termination, to provide services to such entity.

**6. Non-Competition.** During the Employee's employment with the Employer and for a period of two (2) years following the termination of the Employee's employment with the Employer at any time and for any reason, the Employee shall not, on the Employee's own behalf or on behalf of others, directly or indirectly, (whether as an employee, consultant, investor, partner, sole proprietor or otherwise) be employed by, perform

any services for, or hold any ownership interest in any business engaged in the business of freight forwarding services or third-party freight and/or specialized freight logistics, transportation, consulting and/or shipping, including but not limited to or any business that offers and sells (whether directly or indirectly through intermediaries) or assists in or arranges the offer and sale (whether directly to end users or indirectly through intermediaries) of full truckload, less-than-truckload, air freight, express and ground small package services and/or cargo services, or provides warehouse management or carrier supply chain consulting, in any manner with any business within the continental United States.

7. **Security.**

(a) Security and Access. The Employee agrees and covenants (i) to comply with all Employer Group security policies and procedures as in force from time to time, including without limitation those regarding computer equipment, telephone systems, voicemail systems, facilities access, monitoring, key cards, access codes, Employer Group intranet, internet, social media and instant messaging systems, computer systems, e-mail systems, computer networks, document storage systems, software, data security, encryption, firewalls, passwords, and any and all other Employer Group facilities, IT resources and communication technologies ("**Facilities Information Technology and Access Resources**"); (ii) not to access or use any Facilities and Information Technology Resources except as authorized by Employer; (iii) not to engage in the unauthorized downloading of any data from any of Employer's data bases and (iv) not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Employee's employment by the Employer, whether termination is voluntary or involuntary. The Employee agrees to notify the Employer promptly in the event he/she learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction or reverse engineering of, or tampering with any Facilities and Information Technology Access Resources or other Employer Group property or materials by others.

(b) Exit Obligations. Upon (i) voluntary or involuntary termination of the Employee's employment or (ii) the Employer's request at any time during the Employee's employment, the Employee shall provide or return to the Employer any and all Employer Group property, including without limitation keys, key cards, access cards, identification cards, security devices, network access devices, computers, cell phones, PDAs, pagers, fax machines, equipment, manuals, reports, files, books, compilations, e-mail messages, recordings, tapes, disks, thumb drives or other removable information storage devices, hard drives, negatives, data, and all Employer Group documents and materials belonging to the Employer and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Employee, whether they were provided to the Employee by the Employer Group or any of its business associates or created by the Employee in connection with his/her employment by the Employer.

8. **Publicity.** Employee hereby consents to any and all uses and displays, by the Employer Group and its agents, of the Employee's name, voice, likeness, image, appearance and biographical information in, on or in connection with any pictures, photographs, audio and video recordings, digital images, websites, television programs and advertising, other advertising, sales and marketing brochures, books, magazines, other publications, CDs, DVDs, tapes and all other printed and electronic forms and media throughout the world, at any time during or after the period of his/her employment by the Employer, for all legitimate business purposes of the Employer Group ("**Permitted Uses**"). Employee hereby forever releases the Employer Group and its directors, officers, managers employees and agents from any and all claims, actions, damages, losses, costs, expenses and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the period of his/her employment by the Employer, in connection with any of the Permitted Uses.

9. **Employee Acknowledgements.** The Employee acknowledges and agrees that (i) the services to be rendered by him/her to the Employer are national across the continental United Sates in scope, and are of a

special and unique character; that the Employee will obtain knowledge and skill relevant to the Employer's industry, methods of doing business and marketing strategies by virtue of the Employee's employment; and that the terms and conditions of this Agreement are reasonable under these circumstances; (ii) that he/she will not be subject to undue hardship by reason of his/her full compliance with the terms and conditions of this Agreement or the Employer's enforcement thereof; (iii) the restrictive covenants contained herein are independent of any other provision in this Agreement or any other agreement by, among, or affecting the Employer and the Employee and are independent of the existence of any claim or cause of action by the Employee against the Employer; (iv) he/she has fulfilled the terms of all pre-existing employment, noncompetition and confidentiality agreements, and that his/her execution, delivery and performance of this Agreement shall not interfere or conflict with any such pre-existing agreement(s); and (v) if a commissioned salesperson, upon any separation of employment for whatever reason from Employee's position with the Employer, salary is paid on a pro-rated basis through the date of separation, and any unpaid commissions will be forfeited.

**10.** **<u>Reasonableness of Restrictions</u>.** Employee has carefully read and considered all of the provisions of this Agreement and, having done so, agrees that the restrictions put on him/her by virtue of this Agreement (including, but not limited to, the time period of restriction and the geographical areas of restriction) are fair and reasonable and are reasonably required for the protection of the interests of Employer, and will not prevent them from becoming gainfully employed in the future.

**11.** **<u>Future Employers</u>.** The Employee agrees to provide a copy to all future employers of this Agreement and to otherwise make them aware of the restrictive covenants to which Employee is bound.

**12.** **<u>Remedies</u>.** In the event of a breach or threatened breach by the Employee of any of the provisions of this Agreement, the Employee hereby consents and agrees that the Employer shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that monetary damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages or other available forms of relief.

**13.** **<u>Successors and Assigns</u>.**

(a) <u>Assignment by the Employer</u>. The Employer may assign this Agreement to any subsidiary or corporate affiliate in the Employer Group or otherwise, or to any successor or assign (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Employer. This Agreement shall inure to the benefit of the Employer Group and permitted successors and assigns.

(b) <u>No Assignment by the Employee</u>. The Employee may not assign this Agreement or any part hereof. Any purported assignment by the Employee shall be null and void from the initial date of purported assignment.

**14.** **<u>Governing Law; Jurisdiction and Venue; Attorneys' Fees</u>.** This Agreement, for all purposes, shall be construed in accordance with the laws of Florida without regard to conflicts-of-law principles. Any action or proceeding by either Party to enforce this Agreement shall be brought only in any state or federal court located in the state of Florida, county of Hillsborough. The Parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue. The Employee agrees to pay any and all costs, legal expenses and attorneys' fees, paid or incurred by the Employer in enforcing its rights herein.

15. **Entire Agreement.** Unless specifically provided herein, this Agreement contains all the understandings and representations between the Employee and the Employer pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

16. **Modification and Waiver.** No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Employee and by a duly authorized officer of manager of the Employer (other than the Employee). No waiver by either of the Parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the Parties in exercising any right, power or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power or privilege.

17. **Severability.** Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the Parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The Parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement or by making such other modifications as it deems warranted to carry out the intent and agreement of the Parties as embodied herein to the maximum extent permitted by law. The Parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had not been set forth herein.

18. **Captions.** Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

19. **Notice.** Any notices required or permitted to be given hereunder shall be in writing and shall be delivered by (a) hand delivery; (b) a nationally recognized overnight courier service for next business day delivery (any notice given hereunder pursuant to this Section 19(a) or (b) shall be deemed delivered when received or when receipt is refused as evidenced by the records of the delivery or courier service); (c) the United States Postal Service when sent registered or certified mail, return receipt requested, postage prepaid (any properly addressed notice given hereunder pursuant to this Section 19(c) shall be deemed delivered when the return receipt thereof is signed, except that any notice which is correctly addressed but which is returned by the postal service and undeliverable shall be deemed to have been received on the earliest date on which the postal service attempted delivery as indicated by postal service endorsement on the return receipt form); or (d) electronic mail (any notice given hereunder pursuant to this Section 19(d) shall be deemed delivered when sent (as evidenced by e-mail records and facsimile confirmation) provided that a hard copy of such notice shall be sent simultaneously by one of the other delivery methods permitted in this Section 19(a)-(c)), and in each case above addressed to each party at its mailing address or electronic mail address as set forth above.

20. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. The facsimile or electronic signature (e.g., PDF) of any party hereto shall be deemed an original for all purposes.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date above.

David Fahey,
a resident of the state of Illinois

Signature: ______________________

**BLUE-GRACE LOGISTICS LLC**, a Florida limited liability company

By: ______________________

Name: Robert N. Harris

Title: CEO & President

**Final Document:**
**Approved by Blue-Grace**
**Business/Finance/Legal**
SM / MCD / Cb