## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BLUE-GRACE LOGISTICS LLC,

      Plaintiff,

  v.

                                Case No. 8:21-cv-2523-KKM-CPT

DAVID FAHEY, MARK FOX, TYLER
WILKIEL, JASON COLLE, and TRAFFIC
TECH, INC.

           Defendants.

_____

## DEFENDANTS' RESPONSE TO PLAINTIFF'S VERIFIED AMENDED MOTION FOR PRELIMINARY INJUNCTION

"Urgency forms the heart of a preliminary injunction."[1] Blue-Grace waited **8 months and 8 days**[2] from the day that the *last* Individual Defendant left Blue-Grace for Traffic Tech before bringing this Motion for Preliminary Injunction. Moreover, Blue-Grace is chiefly concerned with Defendant David Fahey's employment at Traffic Tech. Yet, Blue-Grace delayed even longer with respect to Fahey, allowing **1 year and 6 days**[3] to lapse between his departure from Blue Grace and this "urgent" request. Blue-Grace's conscious delay is the antithesis of irreparable harm, and this motion should be denied, in its entirety, on this basis alone.

---

[1] *See Wicked Grips LLC v. Badaan*, 8:21-CV-2131-KKM-SPF, 2021 WL 4710488, at *5 (M.D. Fla. Oct. 8, 2021) (Mizelle, J.).

[2] Wilkiel resigned on March 15, 2021. (Amend. Compl., ¶ 50, ECF No. 31.)

[3] Fahey resigned from Blue-Grace on November 27, 2020. (*Id*., ¶ 38.)

There is an explanation for Blue-Grace's delay—just not one that justifies the relief it seeks. Blue-Grace declined to promptly seek injunctive relief because, in reality, the Individual Defendants' career advancement opportunities at Traffic Tech carry no actual threat of unfair competition. Blue-Grace has not been, and will not be, harmed by the Individual Defendants' employment at Traffic Tech. Indeed, Blue-Grace fails to identify even *one* lost sale, *one* lost customer or carrier, or *one* lost opportunity due to the Individual Defendants' employment at Traffic Tech. Thus, even if the Court were willing to overlook Blue-Grace's inexcusable delay in bringing this motion, the agreements are unenforceable because they fail to protect a legitimate business interest. Accordingly, the Court should deny Blue-Grace's motion and grant the Individual Defendants their attorneys' fees as the prevailing parties pursuant to Fla. Stat. § 542.335(k).

## FACTUAL BACKGROUND

## I.   THE TRANSPORTATION LOGISTICS INDUSTRY AND PARTIES

Traffic Tech and Blue-Grace are two of thousands of third-party logistics providers ("3PLs"). (Stapleton Decl. ¶ 1.) 3PLs operate as a "middle-man" between customers—who need to ship goods—and carriers—who physically ship goods via truck, ship, plane, or rail. (*Id.*) Prospective or actual customers typically request bids for a specific shipment from multiple 3PLs at the same time. (*Id.*) The 3PL then contacts multiple carriers to determine their cost and availability for purposes of bidding on the shipment. (*Id.*) The customer then considers the bids and selects the 3PL it wants to broker the shipment. (*Id.)*

Pertinent here, Blue-Grace and Traffic Tech (and most 3PLs generally) have two distinct divisions: (1) customer sales, focused on generating opportunities to bid shipments; and (2) carrier sales, focused on finding carriers that can physically complete shipments. (*Id.*) Here, the <u>Individual Defendants</u> worked exclusively in carrier sales out of Blue-Grace's Chicago office. (*Id.*)

This lawsuit began immediately after <u>Defendant Fahey</u> left Blue-Grace for Traffic Tech. Fahey has worked exclusively for 3PLs over the last decade. (Fahey Decl. ¶ 2.) He began at Coyote Logistics in December 2011, where he worked in carrier sales for over five years—until January 2017. He then joined The Custom Companies for six months as the Director of Carrier Sales. (*Id.*) Through these roles, Fahey gained deep industry knowledge and developed his own strategies for carrier sales and coaching carrier sales representatives. (*Id.* ¶ 3.)

In August 2017, Fahey was recruited to Blue-Grace by his long-time colleague and former manager from Coyote, Mark Ford, who had moved to Blue-Grace. (*Id.* ¶ 4.) Blue-Grace recruited and hired Fahey even though Fahey had active post-employment restrictive covenants with *both* Coyote and The Custom Company. (*Id.* ¶ 5; Defs.' Ex. 23, 24.) Blue-Grace never expressed any concern about these restrictive covenants, hiring Fahey as a Senior Carrier Sales Manager, where Fahey oversaw a carrier sales team that handled day-to-day logistics for shipments to and from the western states. (*Id.* ¶ 5-7.) Together, Ford and Fahey implemented strategies they used at Coyote, and Fahey worked at Blue-Grace with the same carriers he worked with at Coyote. (*Id.* ¶ 8.)

Defendants Jason Colle, Tyler Wilkiel, and Mark Fox are all former Blue-Grace carrier sales representatives, entry-level positions,[4] who left Blue-Grace for Traffic Tech between December 2020 and March 2021. (Colle, Wilkiel, Fox Decls. at ¶ 4.) Blue-Grace has known that these employees joined Traffic Tech since *at least* May 28, 2021. (*See* Pl.'s Mot. Amend. Compl, Ex. A at ¶ 30, ECF No. 1-5, pg 111 (alleging "Traffic Tech has successfully solicited several former Blue-Grace employees"). Yet, Blue-Grace only recently—December 3, 2021 to be exact—added these Defendants to the case. (Pl.'s Amend. Compl., ECF No. 31.)

The Individual Defendants were each required by Blue-Grace to sign identical Employment Agreements. (Pl.'s Ex. A-D.[5]) Colle, Wilkiel, and Fox recall that Blue-Grace first provided the Employment Agreement on their first day of employment, as part of their new hire paperwork. (Colle, Wilkiel, Fox Decls. at ¶ 5.) Unbeknownst to them, the paperwork included a two-year non-compete that prevents them from working for "any business engaged in the business of freight forwarding services or third-party freight and/or specialized freight logistics, transportation, consulting and/or shipping." (Pl.'s Ex. A-D at § 6.)

## II.    COLLE'S, WILKIEL'S AND FOX'S WORK AS CARRIER REPS

As carrier reps, Colle, Wilkiel, and Fox's primarily identified and contacted potential carriers to inquire about their business. (Colle, Wilkiel, Fox Decls. ¶ 6.) When a customer sales representative secured a shipment opportunity, Colle,

---

[4] Colle was later promoted to Carrier Sales Team Lead at Blue-Grace. (Colle Decl. ¶ 4.)
[5] Exhibits submitted by Plaintiff are "Pl.'s Ex." Exhibits submitted by Defendants are "Defs.' Ex."

4

Wilkiel, and Fox would contact carriers about the shipment, and if necessary, negotiate price. (*Id.*) Blue-Grace provided practically no training for this position. (*Id.* at ¶ 7; Defs.' Ex. 2, Pl.'s Resp. Fahey Interrog. No. 15.)  Indeed, Wilkiel was calling carriers by noon on his first day of employment. (Wilkiel Decl. ¶ 7.)

To identify potential carriers for a particular shipment, Colle, Wilkiel, and Fox utilized publicly available information from the following:

1.   "Carrier411" – a database that tracks every single motor carrier registered with the Federal Motor Carrier Safety Administration;

2.   "Freight Friend" – a truckload sourcing and procurement software that connects 3PLs with carriers;

3.   "Carrier Source" – an online database of carriers that includes crowdsourced, verified reviews of carriers that 3PLs can use to locate and qualify potential carriers for their business; and

4.   "DAT One" –a searchable database of over 200,000 active carriers that 3PLs can use to find and qualify potential carriers for loads.

(Colle, Wilkiel, Fox Decls. ¶ 8-9.) These databases and websites contain troves of carrier information and are available to any 3PL, including Traffic Tech.[6] (*Id.*)

 Once potential carriers were identified, the Individual Defendants would contact the carrier directly to ask how many trucks the carrier has, their capacity, the lanes that the carrier services (*e.g.*, Dallas to Chicago), and their rates. (*Id.* ¶ 10.) Because carriers generate revenue by completing shipments for 3PLs, carriers willingly provide this information. (*Id.*)  In working with carriers on

---

[6] Blue-Grace suggests that its internal system, ORCA, contains confidential and trade secret information. However, as far as the Individual Defendants are aware, ORCA only contains information from the online databases noted above, as well as information that the Individual Defendants gathered directly from the carriers and input into ORCA. (Colle, Wilkiel, Fox Decls. ¶ 12.) Blue-Grace has refused to produce the alleged confidential information in ORCA during discovery, rendering Defendants unable to fully assess and defend this allegation. (Defs.' Ex. 2, Pl.'s Resp. Fahey's RFP No. 6.)

specific shipments, Colle, Wilkiel and Fox needed to disclose information about the shipment to the carrier, such as commodity, lane, customer, and potential rates. (*Id.* ¶ 13.) None of the carriers that the Individual Defendants worked with were exclusive to Blue-Grace, and Blue-Grace did not ask any carrier to sign a non-disclosure or confidentiality agreement. (*Id.* ¶ 12-13.)  In other words, Blue-Grace carrier sales rep and the carriers freely exchanged shipment, pricing, and rate information without any confidentiality or non-disclosure restrictions.

## III.   FAHEY LEAVES FOR A CAREER ADVACEMENT OPPORTUNITY

Fahey was promoted to Director of Carrier Sales at Blue-Grace in April 2020. (Fahey Decl., ¶ 9.) In this position, Fahey oversaw Blue-Grace's Carrier Sales Managers for three departments. (*Id.*) Fahey's time in this position was short-lived. Although Fahey took on additional responsibilities, Blue-Grace did not increase his compensation. (*Id.*; Defs.' Ex. 3-4.) Fahey travelled to Florida to request a raise directly from his boss, Ford, but his request was denied. (Fahey Decl., ¶ 10.) Consequently, Fahey felt undervalued and undercompensated and sought alternative employment. (Fahey Decl. ¶ 11; *See* Defs.' Ex. 5.)

On October 30, 2020, a recruiter contacted Fahey via LinkedIn about a role with Traffic Tech as the Vice President of Operations and Carrier Sales. (*Id.*, ¶ 16; Pl.'s Ex. 5; Def.'s Ex. 7.). This led to an interview with Traffic Tech executives Mark Schiele and Brian Stapleton on November 5, 2020. (Fahey Decl., ¶ 16; Def.'s Ex. 8.) On November 16, 2020, Traffic Tech offered Fahey the

position of Senior Vice President of Operations with almost double his salary at Blue-Grace. (Fahey Decl. ¶ 16; Def.'s Ex. 9-10.)

Fahey intended to accept the offer. (Fahey Decl. ¶ 17; See Def.s' Ex. 21 (Nov. 17 text exchange).) But, out of respect for his long history with Ford, Fahey first informed Ford that Traffic Tech offered him better compensation and a step-up in his career. (Fahey Decl. ¶ 17.) On Monday, November 16, 2020, Bobby Harris, Blue-Grace's owner, called Fahey and asked for time to put together a counteroffer. Harris told Fahey that he should reject Traffic Tech's offer (before even seeing Blue-Grace's counteroffer), and stated that if Fahey were to leave, "***I would bury you under the courthouse***." (*Id.* ¶ 18.) The next day, Blue-Grace provided a counteroffer, but it was underwhelming. (*Id.*, ¶ 20-21; Defs.' Ex. 11.) Fahey accepted Traffic Tech's offer on December 1, 2020. (Defs.' Ex. 12.)

## IV.   WILKIEL'S, FOX'S, AND COLLE'S DEPARTURES

Meanwhile, Wilkiel, Fox, and Colle were also discontent at Blue-Grace. (*See* Colle, Wilkiel, Fox Decls. ¶ 14.)  Colle had a similar experience to Fahey; he was offered a promotion, but the offered salary was far below market rate—especially for Chicago, where the three of them worked. (Colle Decl. ¶ 14.) Wilkiel and Fox were still making approximately $40,000 per year, and Fox felt as though Blue-Grace's Chicago office was the "forgotten office." (Fox Decl. ¶ 14.) Each of them were open to alternative employment, and readily interviewed with Traffic Tech after being approached by a third-party recruiter. (Colle, Wilkiel, Fox Decls. ¶ 14-15.) Colle resigned on December 18, 2020, Fox resigned in January 12,

2021, and Colle resigned on March 15, 2021 (Amend. Compl., ¶ 49-51, ECF No. 31.) Upon resignation, Blue-Grace did not express any concern about whether they still had access to, or could use, Blue-Grace's confidential information. (Colle, Wilkiel, Fox Decls. ¶¶ 16-18.)

## V.   BLUE-GRACE FAILS TO PROTECT ITS INFORMATION

Blue-Grace provided Fahey and Colle with laptops so they could work from home. (Fahey Decl. ¶ 24; Colle Decl. ¶ 18.) They were required to use their personal cell phone for work, remotely. (*Id.*) Fahey frequently worked after-hours, and accessed Blue-Grace documents from home. (Fahey Decl. ¶ 24.) For instance, on November 6, 2020, Fahey was on a work call and he could not open a PowerPoint[7] from his Blue-Grace email account. (Fahey Decl. ¶ 25.) Fahey downloaded the PowerPoint on his cell phone and sent it to his personal email to open it from there. (*Id.*; *See* Pl.'s Ex. G.) This was the only purpose for which he forwarded the PowerPoint to his personal email; there was no intent to keep the document after his employment or provide it to Traffic Tech. (Fahey Decl. ¶ 24.)

When Fahey resigned, no one from Blue-Grace requested that he search his email for Blue-Grace documents or turn over his cell phone for inspection. (Fahey Decl. ¶ 24.) As a result, Fahey was unaware that he still had the PowerPoint in his personal email until he found it during discovery. (*Id.* ¶ 25.) Fahey has no other Blue-Grace documents (electronic or hard copy) in his possession. (*Id.*)

---

[7] Blue-Grace filed the PowerPoint under seal. (ECF No. 32; Doc. S20.)

When looking to leave Blue-Grace, Fahey interviewed with Convoy, another 3PL, for a position that would have entailed developing Convoy's carrier sales strategy. (Fahey Decl. ¶ 12.) Before the interview, Fahey organized his relevant knowledge and experience in the industry into a document for reference during the interview. (*Id.*) While Blue-Grace claims this document contains *its* confidential information, the document actually contains Fahey's personal approach to working with carriers, notes from his experiences in the industry, and questions to ask in the interview, such as "What are **Convoy's** high-density lanes?" (*Id.* ¶ 12.) (emphasis added.) Although the document contains three references to Blue-Grace, they are generic references, including: "using ORCA (importance of data)," "selling BlueGrace overall," and "Enterprise Freight vs. BG Sales." (*Id.*) Fahey referred to these bullet points to discuss his experience in the industry. (*Id.* ¶ 14.) He did not reveal any proprietary information about Blue-Grace's business to Convoy, did not send this document to anyone, and has not accessed it since the interview. [8] (*Id.* ¶ 14-15.)

Further, apparently Blue-Grace does not shut-off or monitor access to its systems as part of an employee's exiting process. (*See* Defs. Ex. 2, Pl.'s Resp. Fahey RFA No. 6.) On July 7, 2021, Blue-Grace sent a letter to Traffic Tech, claiming that Fox and Wilkiel had gained "unauthorized access" to ORCA. (*See* Defs.' Ex. 15; *See also* Defs.' Ex. 16, 17.) Traffic Tech immediately investigated

---

[8] Blue-Grace provided this document to the Court under seal. (Pl.'s Mot., at ¶ 22, ECF No. 32.) Metadata for this document shows that it was created on November 9, 2020, and last modified on that that same date. (Defs.' Ex. 6.)

these claims and determined that Fox did <u>not</u> access ORCA after his employment with Blue-Grace ended. (*See* Defs.' Ex. 18; Fox. Decl. ¶ 17.) As for Wilkiel, Traffic Tech explained in a candid letter to Blue-Grace that Wilkiel acknowledged accessing a few phone numbers that "he had previously input ORCA" following his resignation, on his personal computer, "believing that he was permitted to do so since Blue-Grace did not terminate his access and allowed him to continue to log on."[9] (*Id.*; Wilkiel Decl. ¶ 17.) Traffic Tech also noted that "Mr. Wilkiel apparently accessed ORCA back in April 2021, yet Blue Grace first contacted [Traffic Tech] in July—three months later." (*Id.*) Nonetheless, Traffic Tech informed Blue-Grace that it took action to ensure that Wilkiel did not access ORCA again. Traffic Tech confirmed that "he no longer has any [] access" to ORCA and instructed Wilkiel that "he should not access any other Blue-Grace systems or information." Traffic Tech further disclosed to Blue Grace, with Wilkiel's consent, that it issued him a formal disciplinary action for the incident. (Defs.' Ex. 18.) The disciplinary action states that Traffic Tech does not condone his actions and that "[f]urther conduct such as that described in this memo will result in Traffic Tech terminating your employment without further warning."

---

[9] Wilkiel recognizes that he should have exercised better judgment in not accessing ORCA once he stopped performing work for Blue-Grace. However, Wilkiel did not receive proper instruction from Blue-Grace about his post-resignation conduct, nor did Blue-Grace take reasonable steps to prevent this from occurring. (Wilkiel Decl. ¶ 17.)

(Defs.' Ex. 25; Stapleton Decl. ¶ 4.) Blue-Grace never responded to the letter, and Traffic Tech considered the issue resolved as of July 2021.[10] (Stapleton Decl. ¶ 4.)

## VI.  DEFENDANTS HAVE NOT USED BLUE-GRACE INFORMATION

While Blue-Grace claims the Individual Defendants "are in a position to use the business intelligence they gained while at Blue-Grace as well as Blue-Grace's Confidential Information to compete in a way that is adverse to Blue-Grace's business interests" (Pl.'s Amend. Mot. at 12, ECF No. 32), the facts are much different. First, Traffic Tech does not want the Individual Defendants to use Blue-Grace information because it has its own "business processes, practices, and methods; trade secrets and related good will; computer programs, software, applications, and designs; marketing and advertising information; pricing information; supplier, vendor, and distributor lists; customer information and lists; and prospective customer, distributor, supplier and investor information." (*Id.*) Indeed, Traffic Tech requires its employees to use *its* information, not that of a former employer, and Traffic Tech has instructed the Individual Defendants not to bring or use any Blue-Grace information. (*Id.;* Defs.' Ex. 12, § 11. ) None of the Individual Defendants took Blue-Grace information with them when they left Blue-Grace and, with the exception of a few phone numbers that Wilkiel looked

---

[10] Coincidentally, on July 13, 2021, a former Blue-Grace intern who worked at Traffic Tech mistakenly logged into his Blue-Grace Carrier411 account "due to an old password saved in [google] chrome." Carrier411 alerted Traffic Tech, who again investigated, and determined the intern accidentally logged on for "under a minute." Traffic Tech made sure that "[t]he passwords have been cleared from the web browser." (Defs.' Ex. 19; Stapleton Decl. ¶ 6.) This incident has nothing to do with the Individual Defendants. (Fahey Decl. ¶ 27; Stapleton Decl. ¶ 6.)

up in ORCA, none have stolen, used, or disclosed any proprietary information of Blue-Grace. (Fahey Decl. ¶ 29; Colle, Wilkiel, Fox Decls. ¶ 19.)

Second, the Individual Defendants left Blue-Grace almost a year ago. The shipping and transportation market changes rapidly; any information they had access to during their employment with Blue-Grace is now outdated. (Fahey Decl. ¶ 32; Colle, Wilkiel, Fox Decls. ¶ 20.)

Third, Traffic Tech has different customers than Blue-Grace with different shipping needs. As such, information regarding Blue-Grace shipments has little to no relevance to them at Traffic Tech. (Colle, Wilkiel, Fox Decls. ¶ 21.)

Fourth, Traffic Tech was founded thirty years ago. It already has a large network of carriers. ***The Individual Defendants have not, in their employment with Traffic Tech, done a single shipment with a carrier with whom Traffic Tech had not previously worked***. (Fahey Decl. ¶ 31; Colle, Wilkiel, Fox Decls. ¶ 22.) Additionally, Traffic Tech offers different services than those offered by Blue-Grace, which impacts the Defendants' day-to-day responsibilities and the carriers with whom they work. (Stapleton Decl. ¶ 8.)

Finally, the Individual Defendants work exclusively with carriers, and information regarding these carriers is freely available and well-known within the industry. (Fahey Decl. ¶ 31; Colle, Wilkiel, Fox Decls. ¶ 23.) Carriers are not exclusive to 3PLs, and their identities are not confidential. (*Id.*) Neither are their rates, lanes, contact information, or anything else about them. (*Id.*)

Fahey, who climbed the corporate ladder through hard work at multiple 3PLs, has no need for Blue-Grace's information at Traffic Tech. (Fahey Decl. ¶ 29.) Fahey's industry knowledge and experience extends far beyond his employment with Blue-Grace. (*Id.* ¶ 29-30.) Moreover, Fahey's position at Traffic Tech is markedly different from his position at Blue-Grace. At Blue-Grace, his primary duties were coaching/managing carrier sales managers and ensuring the carrier sales team was executing shipments on a day-to-day basis. (*Id.* ¶ 30.) At Traffic Tech, Fahey is not involved in day-to-day shipment management, nor does he coach or manage carrier sales managers. (*Id.*) Fahey is now a Vice President of Operations, responsible for overseeing large scale operations projects to support customer sales, technological developments and advancements, and is involved in executive decision-making. (*Id.*)

## VII.   BLUE-GRACE HAS FAILED TO IDENTIFY ANY HARM

Defendants have repeatedly requested that Blue-Grace identify the specific harm it has experienced due to their employment at Traffic Tech. To date, and despite over a year of litigation, Blue-Grace has provided only sheer speculation that vague categories of information could be disclosed (*See* Defs.' Ex. 2, Resp. Fahey Interrogs. 1, 2, Resp. Traffic Tech Interrogs. 1, 2, 5-9.) Indeed, Blue-Grace admits that it cannot identify a single lost sale as a result of the Defendants' conduct. (*See* Defs.' Ex. 2, Resp. to RFA No. 5, Traffic Tech Interrogs. 5-9.)

## **RELEVANT PROCEDURAL POSTURE**

The procedural history reflects Blue-Grace's delay in moving for an injunction:

- **November 27, 2020**: Fahey resigns from Blue-Grace to work for Traffic Tech. (Pl.'s Amend. Mot., at 11, ECF No. 32.)

- **December 1, 2020**: Blue-Grace files a Complaint and Motion for a Temporary Restraining Order against Fahey based on his employment at Traffic Tech, but does not set a hearing on the motion. (Pl.'s Mot. Temp. Injunction. ECF No. 1-5, at pg. 9.)

- **December 18, 2020:** Colle resigns from Blue-Grace to work for Traffic Tech. (Amend. Compl. ¶ 51, ECF No. 31.)

- **January 12, 2021**: Fahey removes the case to Federal Court. The Court denies, without prejudice, the TRO motion "because it fails to comply with the procedural requirements for seeking injunctive relief in this Court." (Jan. 12, 2021 Order, Defs.' Ex. 29.) Blue-Grace does not re-file the motion.

- **January 12, 2021:** Fox resigns from Blue-Grace to work for Traffic Tech. (Amend. Compl. ¶ 49, ECF No. 31.)

- **February 25, 2021**: Blue-Grace moves for remand. (Pl.'s Mot. Remand, Defs.' Ex. 30.)

- **March 15, 2021:** The last Individual Defendant, Wilkiel, resigns from Blue-Grace for Traffic Tech. (Amend. Compl. ¶ 50, ECF No. 31.)

- **April 20, 2021**: The Court grants Blue-Grace's Motion for Remand. (See Apr. 20, 2021 Order, ECF No. 1-5, at pg 87.)

- **May 28, 2021**: Blue-Grace seeks leave to add Traffic Tech as a Defendant. In relevant part, Blue-Grace alleges that "Traffic Tech has successfully solicited several former Blue-Grace employees." (Pl.'s Mot. Amend. Compl, Ex. A at ¶ 30, ECF No. 1-5, pg 111.)

- **July 7, 2021**: Blue-Grace sends Cease and Desist Letters to Wilkiel, Fox, and Traffic Tech. In its letter to Traffic Tech, Blue-Grace states: "we have recently discovered that Traffic Tech employs other former Blue-Grace employees, including Mark Fox and Tyler Wilkiel." (Defs.' Ex. 15-17.)

- **April 2021 to October 2021**: For six months, the case is active in Florida state court. At no point does Blue-Grace renew or bring a motion for injunctive relief. Defendants remove the case to Federal Court for a second time on October 27, 2021.

- **October 29, 2021**: Blue-Grace files its Motion for Preliminary Injunction based on Fahey's employment at Traffic Tech. Blue-Grace states that it "will be filing a motion for leave to file an amended complaint to add Mark Fox and Tyler Wilkiel as defendants []." (Pl.'s PI Mot., at 1, fn. 1, ECF No. 10.)

- **November 22, 2021**: Blue-Grace files Motion for Leave to File Amended Complaint to add Mark Fox, Tyler Wilkiel, and Jason Colle as defendants. (Pl.'s Mot. Amend. Compl, ECF No. 27.)
- **December 3, 2021**: After a year of litigation, Blue-Grace files an Amended Motion for Preliminary Injunction. (Pl.'s Amend. PI Mot., ECF No. 32.)

With respect to Defendant Fahey, the most notable event is January 12, 2021, when this Court denied Blue-Grace's pending motion for injunctive relief without prejudice and specifically informed Blue-Grace that it could re-file the motion in accordance with the Local Rules. Blue-Grace failed to so for ***almost a year***. With respect to the other Individual Defendants, Blue-Grace knew they were employed at Traffic Tech at least as of May 28, 2021. Yet, Blue-Grace waited until December 3, 2021—***over six months***—to ask for injunctive relief as to them.

## ARGUMENT

To acquire a preliminary injunction, Blue-Grace must establish the following: (1) a substantial likelihood of success on the merits, (2) that it will suffer irreparable harm in the absence of an injunction, (3) the harm it will suffer in the absence of an injunction would exceed the harm suffered by the Defendants if the injunction issued, and (4) an injunction would not disserve the public interest. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002). A preliminary injunction is a "drastic and extraordinary remedy" that should not be granted unless Blue-Grace "clearly establish[es]" the "burden of persuasion" for all four elements. *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014).

## I.     NO IRREPARABLE INJURY WILL OCCUR

Because Blue-Grace's motion unequivocally fails on the second element, irreparable harm, Defendants begin the analysis there. The basis for Blue-Grace's claimed irreparable harm—the Individual Defendants' employment at Traffic Tech—began in late 2020. Fahey and Colle joined Traffic Tech in December of 2020, and all the Individual Defendants were employed by Traffic Tech by April 1, 2021. Yet, Blue-Grace waited until December 3, 2021 to request injunctive relief precluding their employment. This delay undermines any claim that Blue-Grace is experiencing or will experience irreparable harm based on their employment with Traffic Tech. Moreover, Blue-Grace primarily argues in support of irreparable harm that its information is at risk, but it cannot identify a single instance in which any of the Individual Defendants have used or disclosed Blue-Grace's confidential information—despite a year's worth of discovery. Similarly, Blue-Grace cannot identify a single lost sale, decline in revenue, or impact on its goodwill despite that Fahey has now been employed by Traffic Tech for over a year. The reality is that the Individual Defendants' employment at Traffic Tech has had no impact on Blue-Grace's business—which explains why Blue-Grace waited as long as it did to seek emergency injunctive relief.

### A.     *Blue-Grace's Delay Undermines its Claimed Harm*

Blue-Grace's argument regarding irreparable harm rests entirely on the statutory presumption under Fla. Stat. §542.335(j). This presumption is inapplicable, however, because Blue-Grace fails to establish a legitimate interest,

as discussed *infra*. Additionally, this presumption is "rebuttable." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1231 (11th Cir. 2009). When, as is the case here, "there is no evidence that the requested injunction will avoid future irreparable harm," the presumption is rebutted. *Tinubu Square Americas Inc. v. Iguarantee, LLC*, 3:20-CV-880-J-39PDB, 2020 WL 7421382, at *8 (M.D. Fla. Nov. 25, 2020). Blue-Grace's delay, combined with the complete absence of evidence substantiating any harm, rebuts any statutory presumption.

"A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). "The very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." Id. *See Malicious Women Candle Co., LLC v. Cox,* 620CV2013ORL37DCI, 2020 WL 7350399 (M.D. Fla. Dec. 14, 2020) ("Delay in seeking an injunction weighs strongly against that finding of harm."). Blue-Grace has been aware of Fahey's employment since the beginning of the case over a year ago, and it has known about the other Individual Defendants' employment since at least May 28, 2021—seven months ago. Yet, Blue-Grace did not bring its motion for injunctive relief against Fahey until late October 2021 and against Colle, Wilkiel, or Fox until December 2021. "Urgency forms the heart of a preliminary injunction, and [Blue-Grace's] actions confirm that it does not consider its motion urgent." *Wicked Grips LLC,* 2021 WL 4710488 at *5.

Although there is no bright-line rule for how much delay is too much, this district has denied injunctive relief based on similar, or shorter, periods of delay as here. *See Lacroix v. Lee County*, 2:18-CV-143-FTM-38CM, 2018 WL 3536173, at *6 (M.D. Fla. July 23, 2018) (twelve months); *Antoine v. Sch. Bd. of Collier County*, 216CV379FTM38MRM, 2017 WL 9674515, at *11 (M.D. Fla. Dec. 6, 2017) (twelve months); *Badillo v. Playboy Entm't Group, Inc.*, 8:04-CV-591-T-30TBM, 2004 WL 1013372, at *2 (M.D. Fla. Apr. 16, 2004) (nine months); *Pippin v. Playboy Entm't Group, Inc.*, 8:02CV2329T30EAJ, 2003 WL 21981990, at *2 (M.D. Fla. July 1, 2003) (six months); *Tech Traders, LLC v. Insuladd Envtl., Ltd.*, 618CV754ORL40GJK, 2018 WL 5830568, at *3 (M.D. Fla. Nov. 7, 2018) (five months); *Roberts v. Swearingen*, No. 8:18-cv-1062-T-33TGW, 2018 WL 4620707, at *2 (M.D. Fla. Sept. 26, 2018) (four months).

Moreover, the entire premise for Blue-Grace's claim of irreparable harm is simply the fact that the Individual Defendants are employed by Traffic Tech. (*See* Pl.'s Mot. at 21, ECF No. 32.) Blue-Grace's arguments for enjoining Fahey rely almost exclusively on evidence that has been in its possession since December 2020, and Blue-Grace does not point to any evidence with respect to Colle, Wilkiel, or Fox from after May 28, 2021. *See Wreal, LLC* 840 F.3d at 1248–49 (upholding denial of preliminary injunction when the motion "relied exclusively on evidence that was available to [the plaintiff] at the time it filed its complaint").

To its credit, Blue-Grace does even bother to explain its delay. Rather, Blue-Grace vaguely suggests that it was waiting for the case to reach "its final

destination for adjudication." (*See* Pl.s Amend. PI Mot., at 2, ECF No. 32.) However, "the necessity of moving expeditiously" should not be "brushed away." *See Tech Traders, LLC v. Insuladd Envtl., Ltd.*, 618CV754ORL40GJK, 2018 WL 5830568, at *3 (M.D. Fla. Nov. 7, 2018). To excuse its "significant delay," Blue-Grace must present a "good explanation." *InVue Sec. Prod. Inc. v. Vanguard Prod. Group, Inc.*, 8:18-CV-2548-T-33SPF, 2019 WL 4671143, at *6 (M.D. Fla. July 1, 2019). Fahey acted on his statutory right to remove, and Blue-Grace prioritized securing what it considered a more favorable forum (Florida state court) over injunctive relief. That Blue-Grace preferred state court does not justify its departure from "moving expeditiously," which is a "touchstone requirement" of a preliminary injunction.[11] *Tech Traders,* 2018 WL 5830568 at *3. Tellingly, Blue-Grace initiated significant motion practice while the case sat in state court from April 20, 2021, until October 27, 2021—motions addressing everything *but* injunctive relief. (*See* Removal Notice, ¶ 2-12, ECF No. 1.)

Blue-Grace could have set a hearing on its original injunction motion when the case was in state court from December 1, 2020 to January 8, 2021. Blue-Grace could have re-filed its motion when the case was in federal court from January 8, 2021 to April 20, 2021. Finally, Blue-Grace could have sought

---

[11] Blue-Grace secured remand by arguing that Fahey failed to prove that the amount-in-controversy requirement was met. Yet, Blue-Grace's Amended Complaint includes the exact same claims against Wilkiel, Fox, and Colle for breaching the Employment Agreements, and Blue-Grace now readily acknowledges that the amount-in-controversy requirement is met with respect to these claims. (Nov. 29, 2021 Notice, ECF No. 29.) Thus, Blue-Grace can only blame itself for the winding procedural path of this case. *See Castellano Cosmetic Surgery Ctr., P.A,* 2021 WL 3188432 at *9 (denying motion for injunctive relief where delay "[was] due to the joint request of [plaintiff]").

injunctive relief when the case was in state court from April 20, 2021 to October 27, 2021. It elected not to do so.[12] "This significant delay is the antithesis of irreparable harm and a need for prompt action to remedy an urgent predicament." *Car Body Lab Inc., v. Lithia Motors, Inc.*, 2021 WL 2652774, at *1 (S.D. Fla. June 21, 2021); *See also Castellano Cosmetic Surgery Ctr., P.A. v. Rashae Doyle, P.A.*, 2021 WL 3188432, at *9 (M.D. Fla. July 28, 2021).

## B.   *Blue-Grace Fails to Identify Harm to its Business*

Blue-Grace's voluntary delay indicates that its request "is more about gaining an advantage (either a commercial or litigation advantage) than protecting a party from irreparable harm." *Pippin v. Playboy Entm't Group, Inc.*, 8:02CV2329T30EAJ, 2003 WL 21981990, at *2 (M.D. Fla. July 1, 2003). The lack of evidence of harm confirms this is indeed the case. For an injury to be irreparable, it must be "neither remote nor speculative, but actual and imminent." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Blue-Grace relies solely on a statutory presumption of irreparable injury based on the alleged enforceability of the restrictive covenant.[13] (*See* Amend. PI Mot. at 17, ECF No. 32.) However,

---

[12] Even after Blue-Grace informed the Court on October 29, 2021, that it would be adding the other Individual Defendants to the case and seeking injunctive relief against them, it did not take any steps in furtherance of this until *after* the Court directed it to do so. (*See* Nov. 15 Order, ECF No. 24.)

[13] At least one court in this district, sitting in diversity, has held that this statutory presumption is at odds with the Federal Rules of Civil Procedure and has refused to apply it. *See* S. *Wine & Spirits of Am., Inc. v. Simpkins*, 10-21136-CIV, 2011 WL 124631, at *8 (S.D. Fla. Jan. 14, 2011). However, the Court need not address whether the presumption applies here given that Defendants have resoundingly rebutted any possible presumption.

Defendants rebut this presumption based on the complete "absence of injury." *See* Fla. Stat. § 542.335(1)(j); *N. Am. Prod. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1230 (M.D. Fla. 2002).

In *TransUnion Risk & Alternative Data Sols., Inc. v. Challa*, the employer argued that the former employee's "mere presence at [a competitor] created an "irreparable injury," irrespective of the likelihood that [the former employee] actually would disclose its proprietary information or the imminence of actual disclosure." 676 Fed. Appx. 822, 825 (11th Cir. 2017). The district court and the Eleventh Circuit rejected this argument, finding that the employer was unlikely to suffer irreparable harm where the employee "has not and would not use or disclose any of [the employer's] proprietary information while working for [his new employer]," relied on different information for his day-to-day job duties and "the experience he gained outside of his employment at [his former employer]," and had "no need" for his former employer's information. *See id.* at 825.

*TransUnion* is persuasive. The Individual Defendants affirm that they have not and will not use or disclose any of Blue-Grace's confidential information. To carry out their duties, they use information provided by Traffic Tech, information about carriers that is publicly available, and information provided directly by the carriers. *See Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004) ("[I]nformation that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to protection."). Fahey also worked in the industry for five years prior to working at Blue-Grace,

where he acquired the majority of his knowledge, expertise, and contacts. *See GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1335–36 (M.D. Fla. 2010) ("It appears that most if not all of Lewis's knowledge and expertise derives from his experience at Prolink prior to GPSI."). The Individual Defendants simply have no need for Blue-Grace information at Traffic Tech.

Blue-Grace's reliance on *Veterinary Orthopedic Implants, Inc. v. Haas*, 3:20-CV-868-J-34MCR, 2020 WL 5369087, at *1 (M.D. Fla. Sept. 8, 2020) is misplaced. *Haas* does not support the proposition that an employee working for a competitor is enough to justify an injunction, as Blue-Grace argues. To the contrary, the employer promptly moved for injunctive relief one month after the employee resigned *and* provided a robust affidavit from its CEO testifying in great detail about its confidential business information, how it was not publicly available, and how the former employee could use it to harm its business. Much of the declaration was not even disputed by the former employee. *See Haas*, 2020 WL 5369087, at *9-12. This ample evidence provided the Court with concrete threats of injury by virtue of the former salesperson's new position at a direct competitor. *See id.* at *14 ("[A] former [] salesperson us[ing] [its] confidential information to convince [its] customers to purchase from a competitor using that very depiction of [its] products as cheaper knock-offs."). By comparison, Blue-Grace's alleged threat of irreparable harm is wholly lacking any detail or supporting evidence, notwithstanding over a year of litigation. Blue-Grace summarily concludes that "the threatened injury to Blue-Grace includes, as

22

discussed above, improper disclosure of Blue-Grace's business processes, practices, and methods, trade secrets and pricing information to third parties." (Pl.'s Amend. PI Mot. at 23, ECF No. 32.) (emphasis added). Further, the only verification provided by Blue-Grace is a single sentence from Ford that he "read" Blue-Grace's motion and that "the facts stated in it are true the best of my knowledge and **belief**." (*Id.* at 31.) (emphasis added). Blue-Grace utterly fails to identify the specific confidential information that it claims the Individual Defendants could use at Traffic Tech to cause Blue-Grace harm.

Finally, the other restrictions that Blue-Grace seeks (beyond removing the Individual Defendants from their employment) are likewise not supported by any evidence of impending irreparable harm. First, Blue-Grace seeks to enjoin the Individual Defendants from "soliciting or accepting business from current Blue-Grace customers and clients." (Pl.'s Ex. J.) This requested relief goes far beyond the actual non-solicitation terms of the Agreements, which only apply to customers "with which [Blue-Grace] has an agreement, at the time of Employee's termination, to provide services to such entity." (*See* Pl.'s Ex. A-D, § 5.) Blue-Grace has not provided proof of any supposed agreements with its customers or other business entities, nor has Blue-Grace shown that any of the Individual Defendants are soliciting customers (they are not). Second, Blue-Grace seeks to enjoin the Individual Defendants from "soliciting Blue-Grace's employees to terminate [their] employment with Blue-Grace to join Traffic Tech." (Pl.'s Ex. J.) However, Blue-Grace's evidence of employee solicitation is a statement made

"upon information and belief" that Fahey recruited the Individual Defendants to Traffic Tech. Even if that were the case (and Blue-Grace presents no evidence indicating as much), the other Individual Defendants have been at Traffic Tech since March 2021 at the latest, and Fahey has no hiring responsibilities currently. (Fahey Decl. ¶ 30.) Therefore, there is no threat of imminent harm to Blue-Grace.

In summary, Blue-Grace is unable to explain its harm or damage from the Defendants' actions. Surely, if there was "actual and imminent" irreparable harm, Blue-Grace could identify it by now. *See Charles Schwab & Co., Inc. v. Aviles*, 2007 WL 9702744, at *8 (S.D. Fla. Aug. 23, 2007) (noting that "past" conduct is indicative of future harm). Accordingly, Blue-Grace's claims of irreparable harm[14] are "remote and speculative at best." *GPS Indus.*, 691 F. Supp. 2d at 1337.

## II.   BLUE-GRACE IS NOT LIKELY TO SUCCEED ON THE MERITS

Blue-Grace fails to establish irreparable harm, and therefore, its motion fails regardless of whether or not it its claims have a likelihood of success. However, if the Court reaches this part of the analysis, Blue-Grace's motion still fails because Blue-Grace does not establish a legitimate interest in enforcing these sweeping restrictive covenants, which are overbroad as a matter of law.

### A.   *Blue-Grace Fails to Establish a Legitimate Interest*

---

[14] Blue-Grace also relies on the terms of the agreement, wherein it required employees to stipulate that Blue-Grace would suffer irreparable harm. These contractual provisions should be afforded "little to no weight." *See Dragon Jade Int'l, Ltd. v. Ultroid, LLC*, No. 8:17-CV-2422-T-27TBM, 2018 WL 1833160, at *4 (M.D. Fla. Jan. 30, 2018).

"A restrictive covenant cannot be used as a tool simply to eliminate competition." *Thyssenkrupp Elevator Corp. v. Hubbard*, No. 2:13-CV-202-FTM-29, 2013 WL 5929132, at *6 (M.D. Fla. Nov. 4, 2013). "[E]vidence that a party violated a broadly worded restrictive covenant is not enough to warrant relief, because Florida statutory law (as a matter of public policy) does not allow a party to enforce a restrictive covenant unless it proves that ***enforcement is necessary to protect its legitimate business interests.***" *Evans v. Generic Sol. Eng'g, LLC,* 178 So. 3d 114, 116 (Fla. Dist. Ct. App. 2015) (emphasis added). A legitimate business interest is "a business asset that, if misappropriated, would give its new owner an unfair competitive advantage over its former owner." *White v. Mederi Caretenders Visiting Services of Se. Florida, LLC*, 226 So. 3d 774, 785 (Fla. 2017). Accordingly, "there must be special facts present over and above ordinary competition" such that, absent a non-competition agreement, "the employee would gain an unfair advantage in future competition with the employer." *Id.* While unclear, Blue-Grace seemingly claims that its restrictive covenants are designed to protect: (1) confidential information; and (2) substantial relationships with specific prospective or existing customers and customer goodwill. (*See* Pl.'s Mot. at 17-18, ECF No. 32.) Blue-Grace fails to establish the existence of any of these interests.

      *1.*    *The restraints are not necessary to protect substantial customer relationships or good will*

The non-compete cannot possibly be premised on protecting Blue-Grace's relationships with customers, as none of the Individual Defendants worked with

customers and therefore do not have "substantial" relationships subject to protection. *Bradley v. Health Coalition, Inc.*, 687 So.2d 329, 334–35 (Fla. 3d DCA 1997) ("The purpose of the statutory provision is to prevent an employee from taking advantage of a customer relationship which was developed during the term of the employee's employment."). Blue-Grace also cannot premise the non-compete on its carrier relationships, since it makes no attempt to show that it has goodwill with such carriers. In fact, the Agreements do not restrict the Individual Defendants from soliciting carriers, and Blue-Grace does not identify a single carrier with whom it allegedly has goodwill. *See also Evans v. Generic Sol. Eng'g*, LLC, 178 So. 3d 114, 117 (Fla. Dist. Ct. App. 2015) (reversing TRO when employer did not provide "any evidence as to when it conducted business with [customers], the extent of its relationship with [customers] whether its relationship with [customers] was ongoing, whether it had an expectancy of a continued relationship with [customers], or even whether [customers] still existed"). Blue-Grace fails to establish a legitimate interest in protecting goodwill.

> 2. *Blue-Grace has failed to establish the existence of Valuable Confidential Business or Trade Secrets*

"[I]nformation that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to protection." *Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004). Further, Blue-Grace must "articulate exactly how the information is unique or proprietary [and] explain how [Defendants] could unfairly utilize that information to compete against it." *Lucky Cousins Trucking, Inc. v. QC Energy Res. Texas*, LLC,

223 F. Supp. 3d 1221, 1226 (M.D. Fla. 2016). *See also Passalacqua*, 844 So.2d at 796; *Thyssenkrupp Elevator Corp. v. Hubbard*, 2013 WL 5929132, at *5 (M.D. Fla. Nov. 4, 2013). "A blanket assertion that [the Individual Defendants are] in possession of confidential information is not enough." *WellCare Health Plans, Inc. v. Preitauer*, , 2012 WL 1987877, at *3 (M.D. Fla. May 23, 2012).

Here, Blue-Grace's evidence of confidential information is nothing more than a list of general categories of information. (*See* Pl.'s Amend. PI Mot. at 6, 18, 27, ECF No. 32.) From there, Blue-Grace summarily concludes that its information is of great competitive importance and commercial value, but it does not explain how or why. Blue-Grace does not explain what specific business methods, "trade secrets" or "good will" it is referring to. Blue-Grace does not explain how the Individual Defendants' access to a Blue-Grace computer program months ago would give them a competitive advantage today—particularly where Traffic Tech has its own internal software with virtually the same information. Blue-Grace fails to explain how Defendants could use its marketing, advertising, and pricing information when that information is not pertinent to their job responsibilities. Finally, Blue-Grace fails to explain how its prospective customer, distributor, supplier, or investor information is not already publicly available or would be useful to Traffic Tech. Blue-Grace claims the Individual Defendants *could* disclose its information, but "[g]eneralized statements of concern cannot substitute for proof." *Gould & Lamb, LLC v. D'Alusio*, 949 So. 2d 1212, 1214 (Fla. Dist. Ct. App. 2007). See also *Lucky Cousins Trucking, Inc. v. QC Energy Res.*

27

*Texas*, LLC, 223 F. Supp. 3d 1221, 1226 (M.D. Fla. 2016) (denying motion for preliminary injunction in transportation logistics industry because "[g]eneric allegations do not establish a legitimate business interest").[15]

As the Individual Defendants attest, their primary job functions revolve around identifying and communicating with carriers. Information about carriers is publicly available or easily acquired by simply asking the carriers. *See Thyssenkrupp*, 2013 WL 5929132 at *5 ("[I]t appears that most of the 'confidential information' identified in the Verified Complaint can be obtained from other sources."). Further, Fahey relies on the skills and experiences that he developed prior to his employment at Blue-Grace. *See Am. Red Cross v. Palm Beach Blood Bank*, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998) ("An employer may not preclude its former employee from utilizing contacts and expertise gained during his former employment."); *GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1335–36 (M.D. Fla. 2010) ("[I]t appears that most if not all of Lewis's knowledge and expertise derives from his experience at Prolink prior to GPSI.").

Similarly, Traffic Tech has a system that it requires the Individual Defendants to use when conducting business. *See Keel v. Quality Medical*

---

[15] Blue-Grace has had ample time to substantiate its claim that confidential information is at risk but has been largely unable or unwilling to do so. Defendants requested that Blue-Grace produce the information at issue—a request that Blue-Grace objected to as "overbroad and not reasonably calculated to lead to the discovery of admissible evidence." (*See* Defs.' Ex. 2, Pl.'s Resp. to Fahey's RFP No. 8.) Defendants also requested that Blue-Grace identify "with particularity" the confidential information that Blue-Grace contends justifies the non-compete. Blue-Grace recited the generic categories of information from the Complaint. (*See* Defs.' Ex. 2, Resp. to Fahey's Interrog. No. 3.)

*Systems, Inc.*, 515 So.2d 337 (Fla. 3d DCA 1987). The Individual Defendants were expressly instructed to not use or bring Blue-Grace's information to Traffic Tech. Consequently, the Individual Defendants have not used or disclosed any Blue-Grace information, and the record is devoid of evidence to the contrary. *See Passalacqua v. Naviant, Inc.*, 844 So. 2d 792, 796 (Fla. Dist. Ct. App. 2003). Finally, given that nearly a year has passed, any information from Blue-Grace has *de minimis* value to a competitor, if any at all. *TransUnion*, 676 Fed. Appx. at 826 ("[T]he data fusion industry is rapidly evolving, minimizing the usefulness of proprietary knowledge Challa possessed.").

### B.   The Non-Compete is Overbroad and Unreasonable

Blue-Grace largely ignores its burden to show the restrictive covenants are reasonable. They are not, for a variety of reasons. First, the non-compete is nationwide, which is "patently unreasonable." *GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1336 (M.D. Fla. 2010). Second, the non-compete has no activity-based restrictions; it applies to the entire industry regardless of position and responsibilities. *See TrueBlue, Inc. v. Dyn*, No. 809-CV-1894-T-30MAP, 2010 WL 3565756, at *2 (M.D. Fla. Sept. 9, 2010). Finally, the non-compete lasts for two years, a seemingly arbitrary length of time, as Blue-Grace provides absolutely no explanation for this lengthy duration. *See* Fla. Stat § 542.335(1)(d)(1) (non-competes longer than six months are not presumed reasonable); *Sarasota Beverage Co. v. Johnson*, 551 So. 2d 503, 507 (Fla. Dist. Ct. App. 1989) ("The facts of each case determine whether the area and time restrictions are

reasonable."). *Veterinary Orthopedic Implants, Inc. v. Haas*, 3:20-CV-868-J-34MCR, 2020 WL 5369087, at *13 (M.D. Fla. Sept. 8, 2020) (two-year non-compete unreasonable when employer presented "no evidence demonstrating that the contents of the confidential business information will remain viable, relevant and valuable for a full two years"). Blue-Grace does not meet its burden to show the agreements are reasonable.

## III.   ONLY THE INDIVIDUAL DEFENDANTS WOULD BE HARMED

Defendants agree that the balance of hardships "tilts overwhelmingly in favor of preserving the status quo while this case proceeds." (Pl.'s Amend. PI Mot. at 22, ECF No. 32.) But the "status quo" is what has occurred over the past year—which is the Individual Defendants working, without interruption, at Traffic Tech. Given that Blue-Grace has not identified any past harm to its business, there will continue to be no injury to Blue-Grace if an injunction is denied. However, if an injunction is granted, the Individual Defendants will be removed from their positions and the industry in which have they decided to build their careers. For two years, the Individual Defendants will experience significant upheaval and financial setbacks. (*See* Fahey Decl., ¶ 33, Fox, Wilkiel, Colle Decls. ¶ 24.) *See TransUnion Risk*, 625 Fed. Appx. at 407 (rejecting argument advanced by Blue-Grace that a federal court, sitting in diversity, cannot consider hardship to the employee in granting injunctive relief). Likewise, Traffic Tech will experience significant disruption to its business (Stapleton Decl., ¶ 7), even though it has already put safeguards in place to ensure Blue-Grace's information

is not used or disclosed. Thus, the Court should preserve the status quo by denying Blue-Grace's motion.

## IV.   **THE COURT SHOULD AWARD ATTORNEYS' FEES**

Under Fla. Stat. § 542.335(k), "a court may award attorney's fees and costs to the prevailing party in any action [] challenging the enforceability of[] a restrictive covenant." Under this provision, "Florida's courts have not hesitated to enter such an award if authorized to do so," *Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 2013 WL 3815595, at *4 (M.D. Fla. July 22, 2013) (collecting cases), including fees for defending against preliminary injunction motions. *See Sun Group Enterprises, Inc. v. DeWitte*, 890 So. 2d 410, 412 (Fla. Dist. Ct. App. 2004). Fees are particularly appropriate here, where Blue-Grace sought emergency relief even though its own delay establishes there was no urgency and despite case law dictating the need for expedient action—including two recent opinions by this Court. *See Castellano Cosmetic Surgery Ctr., P.A.* 2021 WL 3188432 at *1; *Wicked Grips LLC*, 2021 WL 4710488, at *1.

## CONCLUSION

Blue-Grace's complete lack of urgency demonstrates there is no need for the extraordinary injunctive relief Blue-Grace now seeks. Defendants respectfully request that the Court deny Blue-Grace's motion for a preliminary injunction.

December 27, 2021                By:    *s/ Pamela Abbate-Dattilo*
                                        Pamela Abbate-Dattilo (admitted *pro hac vice*)
                                        Lukas S. Boehning (admitted *pro hac vice*)
                                        **FREDRIKSON & BYRON, P.A.**
                                        200 South Sixth Street, Suite 4000
                                        Minneapolis, MN  55402-1425
                                        (612) 492-7000
                                        (612) 492-7077 Fax
                                        pabbatedattilo@fredlaw.com
                                        lboehning@fredlaw.com

                                        ***Attorneys for Defendants***


## CERTIFICATE OF SERVICE

I CERTIFY that on December 27, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the parties of record.


                                 By:    *s/ Pamela Abbate-Dattilo*
                                        Pamela Abbate-Dattilo